**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**TUCSON**

| | |
|---|---|
| Jason Adam Jensen,<br>Plaintiff,<br>v.<br><br>Citibank NA, et al.,<br>Defendants. | **Case No. CV-25-00434-TUC-JGZ**<br><br>**MOTION FOR RECONSIDERATION OF ORDER DENYING LEAVE TO PROCEED IN FORMA PAUPERIS (DOC. 8) AND REQUEST FOR RELIEF UNDER FRCP 59(e) AND 60(b)**<br><br>**(Oral Argument Requested)** |

## I. INTRODUCTION

Plaintiff Jason Adam Jensen ("Plaintiff"), proceeding *pro se*, respectfully moves this Honorable Court pursuant to Local Rule of Civil Procedure ("LRCiv") 7.2(g), and Federal Rules of Civil Procedure ("FRCP") 59(e) and 60(b), to reconsider its Order dated January 14, 2026 (Doc. 8), which denied Plaintiff's Application to Proceed *In Forma Pauperis* ("IFP") and ordered payment of filing fees.

Reconsideration is warranted because of **(1) new facts** regarding Plaintiff's immediate financial liabilities—specifically significant medical/dental debts incurred just prior to the Order—and **(2) manifest error** in the Court's factual determination that Plaintiff's food expenses are "discretionary." New evidence demonstrates that the Court's assumption regarding the cost of basic nutrition is mathematically impossible in the current economic market, and the denial of IFP in this specific ADA arbitration context creates a structural barrier to justice.

## II. LEGAL STANDARD

A. District of Arizona Local Rule 7.2(g)

LRCiv 7.2(g)(1) provides that a court will grant a motion for reconsideration upon a "showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence."

B. "Necessities of Life" Standard

The Supreme Court has held that an affidavit is sufficient if it states that the person "cannot because of his poverty pay or give security for the costs and still be able to provide himself and dependents with the necessities of life." Adkins v. E.I. DuPont de Nemours & Co., 335 U.S. 331, 339 (1948). Food and shelter are primary necessities of life.

**III. ARGUMENT**

A. Direct Challenge to Franklin v. Murphy and the "No Case on Point" Barrier

The Court's Order (Doc. 8) relies on Franklin v. Murphy, 745 F.2d 1221 (9th Cir. 1984), to frame IFP status as a privilege that can be restricted to prevent abuse. Implicit in this denial—and in the standard review of pro se complaints—is the requirement that Plaintiff show a likelihood of success based on existing legal precedent (i.e., a case "on point"). This application constitutes manifest error because it ignores Plaintiff's fundamental constitutional right to access the courts for the express purpose of changing or extending the law.

1. The Constitutional Right to Litigate for Legal Change

The Supreme Court has repeatedly established that litigation aimed at reforming the law is protected First Amendment activity, regardless of whether a case is currently "on point."

- **"Litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment... The litigation it assists... is a form of political expression."** *NAACP v. Button*, 371 U.S. 415, 429, 431 (1963).
- **"The right of access to the courts is indeed but one aspect of the right of petition."**

*California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

- **"The First Amendment protects the right of access to courts for redress of wrongs... That right cannot be limited to the redress of grievances that are guaranteed to succeed."** *BE&K Construction Co. v. NLRB*, 536 U.S. 516, 525 (2002).

2. Novelty Does Not Equal Frivolity

Plaintiff's Complaint raises novel and complex issues for which there is no case on point precisely because the theories challenge the status quo of the arbitration industry. Specifically:

- **ADA Accommodations in Private Arbitration:** There is no controlling precedent explicitly requiring the American Arbitration Association (AAA) to provide ADA accommodations or face liability. Plaintiff seeks to establish this duty.
- **Trademark Obfuscation via Confidentiality:** There is no controlling precedent holding that a limited monopoly (trademark holder) cannot use the Federal Arbitration Act (FAA) and confidential arbitration clauses to conceal the actual quality of their mark from the public. Plaintiff seeks to establish that such obfuscation violates the Lanham Act and antitrust principles.

To deny IFP because Plaintiff cannot cite a case "on point" is to fossilize the law. It effectively rules that an indigent plaintiff may only enforce rights that have *already* been fully established by wealthy litigants. This contradicts the Supreme Court's recognition that courts exist to "say what the law is" (*Marbury v. Madison*) and that litigation is the "sole practicable avenue" for minorities to achieve equality (*NAACP v. Button*).

3. Distinguishing Franklin: The Certification Requirement

The Court's reliance on Franklin is misplaced. Franklin involved a prisoner filing over 100 suits

on absurdities like "horse seatbelts." Franklin, 745 F.2d at 1229. Crucially, Franklin imposed a remedy for abuse: "Petitioner may not file any civil action without leave of court. In seeking leave of court, petitioner must certify that the claims he wishes to present are new claims never before raised and disposed of on the merits by any federal court. Upon failure to certify or upon a false certification, petitioner may be found in contempt of court and punished accordingly." Id. at 1232.

Plaintiff's point is simple: **He can make that certification right now, without a court order.** The claims in this case (ADA/Trademark/Arbitration) are entirely distinct from his other pending matters (Eviction, etc.) and have *never* been disposed of on the merits by any federal court. By effectively preempting this certification with a denial of IFP, the Court is treating Plaintiff *worse* than the sanctioned litigant in *Franklin*, barring access before any adjudication on the merits has occurred. Plaintiff is compliant with the anti-abuse spirit of *Franklin* and should not be penalized for the volume of distinct legal injuries he has suffered.

4. Manifest Error: Retroactive Imposition of Limits Without Process

The Court's citation to Franklin implies that Plaintiff is being subjected to a filing limit due to the volume of his cases. However, Franklin explicitly forbids the imposition of such limits without specific procedural safeguards. The Ninth Circuit held:

> **"An order limiting a prisoner's access to the courts must be designed to preserve his right to adequate, effective, and meaningful access, Bounds, 430 U.S. at 822, 97 S. Ct. at 1495, while protecting the court from abuse. We agree with the district court that six free filings per year should be adequate access, but we cannot be certain that it will. If a request is made for the filing of additional cases beyond the number prescribed by the court, Franklin must be afforded an opportunity to make a showing that the**

> **limitation to six filings is prejudicial because inclusion of these claims by amendment of his existing claims is not possible. If such a showing is made, the district court must amend its order. This will avoid the constitutionally questionable conclusive presumption that all of Franklin's subsequent submissions are frivolous or malicious. See In re Green, 669 F.2d 779 (D.C. Cir. 1981) (order barring all further IFP filings as sanction for abuse violates fourteenth amendment)."** *Franklin*, 745 F.2d at 1231-32.

Here, the Court has not issued a pre-filing order. It has not made a finding of abuse. Instead, it has retroactively applied a *de facto* limit by denying IFP in this matter based on the existence of other filings, without affording Plaintiff the **"opportunity to make a showing that the limitation... is prejudicial"** as mandated by *Franklin*. By skipping the due process requirements of notice, opportunity to respond, and a tailored order, the Court has applied the sanction of *Franklin* while violating the very safeguards *Franklin* established to protect the Fourteenth Amendment rights of indigent litigants.

B. The Complexity of Law vs. The Absence of Pro Se Opportunity

It is abundantly clear that Plaintiff does not possess the "term of art" vocabulary required to perfectly articulate a "plain statement" or mechanically demonstrate "that relief may be granted" under the strictest legal standards. These are terms of art honed by years of professional training. However, the purpose of law is not to deny justice based on a lack of artistic flourish or technical precision.

The complexity of federal law requires that any person be given the opportunity to learn. A licensed attorney not only receives formal education for this task but is afforded mock trials, clinics, and mentorship to develop these skills before entering the courtroom. That potential

for experience is entirely absent in all pro se avenues. The pro se litigant must learn by doing, on the record, in real-time.

To interpret Plaintiff's lack of technical perfection as evidence of "frivolity" or "abuse" is a manifest error. It penalizes the indigent for lacking the very education that the system denies them. Plaintiff’s filings are not abusive; they are the earnest, if imperfect, attempts of a citizen to navigate a labyrinthine system to enforce fundamental rights.

C. Statutory Mandate: The ADA's Purpose Echoes the Constitutional Right to Litigate

The Court's denial of IFP must be weighed against the specific Congressional purpose of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. Congress explicitly found that individuals with disabilities are a specific class requiring judicial protection because they lack political power.

- **Congressional Finding:** "Individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals..." 42 U.S.C. § 12101(a)(7).
- **The Constitutional Echo:** This finding echoes the Supreme Court’s recognition that litigation is the necessary recourse for those without political leverage.
  - *"Groups which find themselves unable to achieve their objectives through the ballot frequently turn to the courts." NAACP v. Button*, 371 U.S. 415, 430 (1963).
  - *"Collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." United Mine Workers v. Illinois State Bar Association*, 389 U.S. 217, 222 (1967).

Congress identified the protected class as "politically powerless." The Supreme Court

identifies the courts as the constitutionally protected avenue for the politically powerless. Therefore, barring access to the courts via financial hurdles for this specific class frustrates the core statutory and constitutional design. The ADA was intended to provide "no legal recourse" with a remedy (42 U.S.C. § 12101(a)(4)); denying IFP strips that remedy away.

D. New Facts: Immediate Medical Insolvency (Exhibit A)

The Court's Order (Doc. 8) was entered on January 14, 2026. However, on January 6, 2026—only one week prior—Plaintiff incurred significant and necessary dental expenses that fundamentally altered his financial landscape.

As evidenced by the Treatment Case Plan attached hereto as **Exhibit A**, Plaintiff has been assessed a "Patient's Portion" of liability totaling **$3,700.00** for necessary dental procedures, with an immediate balance due of **$216.00** for the first visit alone. This liability was not reflected in the financial affidavit originally submitted. Requiring Plaintiff to pay $405.00 in court fees while facing a $3,700.00 medical debt for essential healthcare constitutes a manifest hardship.

E. Manifest Error: The "Discretionary" Food Budget Fallacy (Exhibit B)

The Court denied IFP status largely on the finding that Plaintiff's $1,200 monthly food expense is "discretionary spending beyond strict necessity." This finding is factually incorrect and relies on unrealistic poverty guidelines that do not reflect current market realities for a single adult with dietary needs.

1. Mathematical Impossibility of the Court's Implied Budget

The Court implies Plaintiff should survive on a fraction of his current food spending (likely referencing the USDA "Thrifty" plan of ~$300/month). This assumption is demonstrably false.

- **Market Reality:** The current cost of lean ground beef alone is approximately

$7.00–$9.00 per pound.

- **The Math:** If Plaintiff were to consume *only* one pound of beef per day (a basic protein requirement) and *nothing else*, the cost would be roughly $270.00 per month. Adding milk, eggs, cooking oil, and basic produce immediately pushes the cost of a bare-survival diet well beyond $400–$500 per month.

2. Evidence of Actual Spending (Exhibit B)

Plaintiff attaches Exhibit B, a summary of receipts from Walmart and Target for the first 13 days of January 2026 alone.

- **Total Spent (Jan 1–13): $413.06**
- **Conclusion:** These purchases (frozen chicken, ground beef, milk, eggs, fruit) are basic staples. The fact that basic sustenance costs $400 for *two weeks* proves that a $1,200/month estimate is an accurate reflection of market prices, not "discretionary" waste.

3. Involuntary Loss of Cooking Infrastructure (Judicial Notice)

The Court must take judicial notice that in Jensen v. Arizona, State of (Case No. 4:25-cv-00464-JGZ), the record reflects Plaintiff was unlawfully evicted in June 2025 and lost possession of essential cooking utensils. Without the infrastructure to cook from scratch, Plaintiff is forced to rely on pre-prepared foods, which carry a higher market cost. This is not a "discretionary" choice but a direct consequence of the injuries Plaintiff is litigating.

F. Manifest Error: Structural Deficiency in Assessing Housing Costs (Form AO 239)

The Court's Order relied on the "expenses" section of Plaintiff's application, which reflected a period of instability and homelessness (hotel living) resulting from the unlawful eviction cited above. Form AO 239 is structurally deficient in capturing the projected necessity of re-establishing stable housing.

- **The Reality:** The "actual" costs paid during the relevant period did not cover the full cost of a standard lease. To secure housing, Plaintiff requires approximately **$1,100.00 for a security deposit** and **$1,100.00 for first month's rent**.
- **The Error:** By looking only at the "snapshot" of expenses paid during a crisis, the Court failed to account for these necessary future liabilities. Denying IFP strips Plaintiff of the ability to save the $2,200.00 required to cure his homelessness.

G. Manifest Error: Incorrect Finding of "No Debt" (Judicial Notice)

The Court's Order states that Plaintiff "lists no debts." This finding is demonstrably incorrect. In Jensen v. Navy Federal Credit Union (Case No. 4:25-cv-00460-JGZ), this Court has previously acknowledged Plaintiff's debt of approximately $7,000.00 owed to Navy Federal Credit Union. Ignoring this significant liability constitutes manifest error.

H. Manifest Error: Violation of Disability Protections

The Court's order implies Plaintiff must alter his food habits to afford fees. However, Plaintiff's dietary choices are linked to his disabilities. In Forma Pauperis is a federal program. Under the Rehabilitation Act and the ADA, federal programs cannot penalize individuals for disability-related needs. Conditioning access to the court on the abandonment of a required health regimen violates these protections.

I. Manifest Error: Mischaracterization of Mental Health Needs

For Plaintiff, whose disability carries a high risk of isolation, "eating out" is a necessary social activity ensuring community presence. By mandating Plaintiff retreat to his home to consume the cheapest calories in solitude, the Court effectively orders Plaintiff’s social segregation, contrary to the integration mandate of the ADA.

J. Access vs. Abuse: Distinguishing Franklin v. Murphy

The Court's Order cites Franklin v. Murphy, 745 F.2d 1221 (9th Cir. 1984), to support the denial

of IFP. Reliance on Franklin to imply that Plaintiff's filings constitute "abuse" or "frivolousness" is manifest error because it ignores the stark factual distinctions between that case and the present matters.

- **Frivolity vs. Substance:** In *Franklin*, the appellant had filed over 100 actions, many of which were undeniably frivolous (e.g., suing a TV announcer for misidentifying a truck, suing about seatbelts for horses). *Id.* at 1229. In contrast, Plaintiff's approximately 16 cases involve **substantive, life-impacting issues**: unlawful eviction, medical debt, banking discrimination, and ADA violations. Plaintiff is seeking redress for specific economic and civil rights injuries, not engaging in "wholly fanciful" litigation.
- **The Fundamental Rights Exception:** *Franklin* explicitly acknowledges that indigents cannot be required to pay fees for actions involving "fundamental constitutional rights," citing *Boddie v. Connecticut*. *Id.* at 1230. Enforcing the ADA against systemic discrimination—especially where no private counsel will take the case due to lack of damages—functionally constitutes a fundamental right for the disabled indigent. To apply the *Franklin* "abuse" standard here is to punish Plaintiff for the "volume of injury" he has sustained, rather than any abuse of process.

K. The Monetization of Justice: Popularity, Crowdfunding, and the Exclusion of the Disabled

The Court's denial of IFP suggests that the payment of fees acts as a necessary filter for serious or meritorious litigation. However, the current digital reality demonstrates that popularity—not legal merit—is often the determining factor in who pays fees.

1. The "Popularity" Filter and GoFundMe

Platforms like GoFundMe allow fundraisers for legal expenses, including filing fees, within their terms of service. While specific statistics on "filing fee" campaigns are not public, reports as early as 2019 noted over 2,300 campaigns featuring the word "attorney," a number that has

likely surged. The success of these campaigns is dictated by "popularity" and social virality, not the justice of the cause. Crucially, mental health rights and advocacy for the "mentally disabled" (a protected class under the ADA) are historically stigmatized and do not generate the "popularity" required to fundraise. By adhering to a strict fee requirement, the Court inadvertently endorses a system where "popular" causes find easy access to the docket via crowdfunding, while stigmatized civil rights claims are priced out.

2. The "Delete Lawz" Precedent

This disparity is concretely illustrated by DeCastro v. Las Vegas Metropolitan Police Department (D. Nev. Case No. 2:23-cv-00580). The plaintiff in that matter (known as "Delete Lawz") broadcasted his intent to file a lawsuit while soliciting funds from his YouTube audience. The video of this event, titled "Lets File My Lawsuit Against The Las Vegas Tyrant Cops From My Unlawful Arrest. #audit #court #popo", is located at https://www.youtube.com/watch?v=Pgn2nq9uWJU. The transcript of this broadcast reveals the specific mechanism by which the fee was secured:

> "I need to crowdfund $402 to file this lawsuit that's what I need to do... I'm gonna Sue Las Vegas metro PD for $5 million that's what I'm going to do... I got to raise 402 bucks right now to sue Las Vegas Metro Police Department" (Transcript at 1:27, 20:13).
>
> "as soon as I'm able to raise the 402 I'm going to walk in here and I'm going to file this lawsuit" (Transcript at 24:00).
>
> "I got 120 on PayPal I've got 50 here that's 170... we're getting closer... I got to raise $42 right now so that I can file this lawsuit" (Transcript at 25:59, 32:54).

The court record confirms that Mr. DeCastro filed his Complaint (Dkt. 2) with the $402.00 fee noted as **PAID**. Mr. DeCastro financed his economic activity through the "popularity" of his

social media presence.

3. The Exclusion of the Legally Neglected

Contrast this with Plaintiff, who is lobbying the Court for the recognition of Civil Rights for the "mentally" disabled—a major protected class under the ADA. Because this class is socially marginalized rather than "viral," Plaintiff cannot crowdfund fees on the courthouse steps. To deny IFP to an indigent advocate for the mentally disabled, while the doors swing open for those who monetize "cop watching," is to fail the very class of citizens the In Forma Pauperis statute was designed to protect.

L. Manifest Error: The Fee as a Barrier to ADA Enforcement and State Reform

The denial of IFP does not just bar a "case"; it bars the enforcement of federal disability rights in specific, complex contexts involved in these matters.

1. Enforcing the ADA in Private Arbitration (Citibank - Case No. CV-25-00434)

In Jensen v. Citibank (CV-25-00434), Plaintiff seeks to enforce ADA compliance within the private arbitration framework. The filing fee acts as a gatekeeper not just to the Court, but to the arbitration process itself. By pricing Plaintiff out of the District Court, the Court effectively immunizes private entities from ADA oversight, allowing them to bypass federal accessibility standards simply because the victim is indigent.

2. State Fragmentation and Avery v. Midland County

These cases also challenge the constitutionality of Arizona's Title 36, Chapter 5 (Mental Health Services). The current state structure forces individuals into "evaluations and treatments" involving a fragmented network of actors—law enforcement, hospitals, doctors, and courts. This process often proceeds without requiring actors capable of diagnosing complex conditions like autism, leading to misdiagnosis and harm. In Avery v. Midland County, 390 U.S. 474 (1968), the Supreme Court held that a state cannot fracture itself into political

subdivisions to avoid compliance with federal rights (specifically voting). Similarly, Arizona cannot fracture its mental health obligations across various agencies (police, hospitals, courts) to evade ADA compliance. The filing fee requirement prevents Plaintiff from challenging this systemic fragmentation, leaving the "program" of Title 36 immune from federal scrutiny.

3. The "Proof" Trap and the Denial of Immediate Accommodation

Finally, the fee denial ignores the reality of how ADA rights are (or are not) operationalized by state actors. When Plaintiff requests accommodations during interactions with state actors (e.g., police under Title 36), the demand for immediate "proof" of disability acts as a constructive denial of the accommodation. A police officer or intake worker demands evidence that cannot be produced in a crisis, rather than assessing the immediate need. There is no functional legal layer binding these "first impression" actors to recognize a disability notification without formal documentation. Plaintiff’s litigation seeks to establish this binding notification duty. By denying IFP, the Court ensures that this "catch-22" remains the status quo for the disabled indigent.

M. Manifest Error: The Structural Necessity of IFP in ADA Litigation

While 28 U.S.C. § 1915 applies to all case types, it is structurally vital for ADA claims due to the specific economic reality of disability rights litigation.

1. The Lack of Punitive Damages (The Economic Disincentive)

As the courts have repeatedly affirmed, punitive damages are generally unavailable under Title II of the ADA and the Rehabilitation Act (see Barnes v. Gorman, 536 U.S. 181 (2002)) and are often limited or nonexistent in 42 U.S.C. § 12203 retaliation claims. Because there is no "pot of gold" (punitive damages) at the end of litigation, private attorneys will not invest the significant time and capital required to litigate these complex civil rights cases on a

contingency basis. The most an attorney can typically hope for is an award of "fees and costs," which is a high-risk, uncertain endeavor.

2. Antithetical to Congressional Intent: The "Abuse" Trap

Congress enacted the ADA (42 U.S.C. § 12101 et seq.) with the explicit intent to eliminate discrimination against individuals with disabilities, including the "mentally ill." Congress understood these conditions often correlate with poverty. It is antithetical to the purpose of the ADA to grant a disabled person the right to a claim, but then construct a system where:

(a) The claim is economically unviable for private counsel (due to lack of damages);

(b) The Court provides no appointed counsel for civil matters; and

(c) The Court relies on the "mentally ill" to enforce the statute pro se.

As the Court interprets the ADA, it has made the disabled individual solely responsible for the enforcement of the law (due to the lack of provided counsel). It is manifest error to then characterize these necessary, amateur attempts at enforcement as "abuse" or "frivolousness." This reality must be contrasted with the abilities to be expected from the protected class and the sheer complexity of the federal legal process. The system forces the mentally ill into the role of attorney, then punishes them for the inevitable procedural imperfections or volume of their filings. By refusing to accommodate this disparity, the Court has essentially decreed that justice cannot flex in process for such a situation. Consequently, the writing of the ADA results in a predictable absurd result: a purported civil right that is operationally unenforceable by its intended beneficiaries.

3. Volume of Cases Reflects Systemic Failure, Not Abuse

The volume of cases exists precisely because no attorney will take them due to the economic disincentives described above. Plaintiff must file individually for each distinct violation because he lacks the resources to consolidate them or the counsel to manage them. To

punish Plaintiff for self-representation by denying IFP is to punish him for the very economic reality Congress sought to address.

**N. Manifest Error: Reliance on the Statistically Flawed Federal Poverty Level (FPL)**

1. The Court's Calculation vs. The Threshold

The Court's denial relies on the finding that Plaintiff's annual income of $31,116 (derived from $2,593/month SSDI) is "more than double the poverty guideline." While mathematically accurate against the raw Federal Poverty Level (FPL), this comparison is legally and economically unsound because the FPL is structurally detached from the modern cost of survival.

- **Plaintiff's Income:** $2,593/month (Source: SSDI/Disability).
- **150% FPL (2025):** Approximately $1,956/month for a household of one.
- The Delta: Plaintiff is approximately $637/month above the 150% cutoff used by many courts as a heuristic for indigency.

  However, this "surplus" of $637 is illusory when tested against the actual cost of living in 2026, rather than a statistical model frozen in the 1960s.

2. The Structural Obsolescence of the FPL

The Federal Poverty Level is not a modern cost-of-living measure. It was created in the early 1960s based on a USDA "economy food plan"—a specific basket of food quantities—multiplied by three, because families at that time spent approximately one-third of their income on food.

Since its adoption, the government has never recalculated the basket to account for modern realities. Instead, the 1960s threshold is merely adjusted annually using the Consumer Price Index (CPI). This methodology is fundamentally flawed for determining actual ability to pay because:

- **No Housing Model:** It does not account for the explosion in housing costs relative to food costs.
- **No Medical/Insurance Model:** It ignores modern insurance premiums and out-of-pocket medical costs.
- CPI Substitution: The CPI itself allows for "substitution" (e.g., assuming a consumer buys chicken when beef becomes too expensive) and "hedonic adjustments," effectively masking the real rise in survival costs.

  The result is that the poverty line today represents what a 1963 food-based survival budget looks like after decades of inflation adjustment, not what it costs to live in 2025.

3. The "Multiplier" as an Implicit Admission of Failure

The fact that courts, clinics, and utility assistance programs routinely use multipliers (150%, 200%, or even higher) to determine eligibility is an implicit admission that the base FPL (100%) is too low to function as a real-world threshold for survival. The system acknowledges that a person at 100% FPL is destitute, and a person at 150% is still "actually struggling."

4. Plaintiff's Reality vs. The Statistic

The Court's reliance on this statistic creates a false conclusion of solvency.

- **Income:** $2,593/month.
- **Fixed Costs (Rent/Util):** -$928/month.
- **Food (Actual):** -$1,200/month.
- Remaining: $465/month.

  From this remaining $465, the Court expects Plaintiff to cover hygiene, transportation, clothing, internet (for court access), and now, the new medical debt of $3,700.00 (Exhibit A).

  Statistically, Plaintiff is "above the line." Functionally, Plaintiff is insolvent. By denying IFP

based on the FPL, the Court is enforcing a 1960s standard of poverty that demands 2026 dollars to survive.

O. Manifest Error: The Incompatibility of FPL Strictness with ADA "Request-Based" Rights

The Court's rigid application of the FPL fails to account for the unique operational nature of the ADA. Unlike "negative" liberties (which require the state to merely refrain from action), the ADA confers "positive" rights that often require the beneficiary to affirmatively approach a public body and request accommodation to trigger the state's duties.

In the context of mental health, this "request" mechanism is systematically broken; the request is rarely honored without significant friction. Consequently, realizing the ADA in application necessitates that the disabled person expend significant resources—time, communication, navigation of bureaucracy—on a strictly limited budget to force the accommodation.

By using the FPL to deny IFP, the Court forces the Plaintiff to divert those critical survival/advocacy resources into court fees. This creates a functional paradox: the ADA explicitly mandates that accommodations be provided without fee or surcharge. Yet, to enforce that right, the Court requires an expenditure that depletes the very resources needed to navigate the accommodation process. The FPL analysis treats the Plaintiff as a generic consumer, failing to recognize that for a disabled litigant, financial solvency is the only tool available to convert a "paper right" into a functional reality.

P. Immediate Financial Impossibility: The Cumulative Demand

On January 13 and 14, 2026, this Court issued four denials of IFP status (Case Nos. 00241, 00526, 00434, and 00423).

- **Case 00241:** $405.00
- **Case 00526:** $405.00

- **Case 00434:** $405.00
- **Case 00423:** $405.00
- **Total Immediate Demand: $1,620.00**

Demanding $1,620.00 within 30 days—approximately 60% of Plaintiff's monthly SSDI income—creates an insurmountable barrier to the judicial system. The cumulative effect of these orders is to price Plaintiff out of court entirely, violating the constitutional guarantee of access to justice for the indigent.

### IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court:

1. **Grant** this Motion for Reconsideration;
2. **Vacate** the Order denying IFP in Case No. 4:25-cv-00434-JGZ; and
3. **Grant** Plaintiff's Application to Proceed *In Forma Pauperis* in this matter.

Respectfully submitted this 14th day of January, 2026.

/s/ Jason Adam Jensen

Jason Adam Jensen

Plaintiff Pro Se

### CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2026, I electronically filed the foregoing Motion with the Clerk of the Court using the CM/ECF system in the above-referenced case.

/s/ Jason Adam Jensen

Jason Adam Jensen

## CERTIFICATE REGARDING USE OF ARTIFICIAL INTELLIGENCE

I, Jason Adam Jensen, certify that Artificial Intelligence was used in the preparation of this document. I have reviewed and verified the accuracy and appropriateness of the AI-generated content and take full responsibility for it as if it were my own work, in accordance with FRCP 11 and all applicable Local Rules. This system is designed to take evidence uploaded, statements made, and claims alleged to draft a legal document on point based on the regulatory documents for universal access to the law.

This document was drafted or prepared with the assistance of Google Gemini [District of Arizona Playground] system operating under a framework with a functional description located at https://github.com/TemperedEnterprises/DistrictOfArizonaAIRegulatory. The use of this system to draft this document is grounded in my own instructions and intent.

*/s/ Jason Adam Jensen*

**Jason Adam Jensen**

**DISCLAIMER:** User is solely responsible for filing this document. If a licensed attorney files this document without independent review, it constitutes a violation of the Open Artificial Intelligence Regulatory Documents Licensing Agreement and the attorney forfeits further access to this playground.